**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

PIONEER TELEPHONE COOPERATIVE,  )
  INC., as Sponsor, Administrator, and  )
  Fiduciary of the Pioneer Telephone  )
  Cooperative, Inc. Employee Benefit Plan,  )
  and PIONEER TELEPHONE EMPLOYEE  )
  WELFARE BENEFIT PLAN,  )
                              )
       Plaintiffs,  )
                              )
vs.  )          NO. CIV-07-37-D
                              )
STEVEN TERRY, YONEVEA TERRY,  )
  JAMES E. DUNN, and JAMES E. DUNN  )
  & ASSOCIATES, PLLC, f/k/a JAMES E.  )
  DUNN & ASSOCIATES, PC,  )
                              )
       Defendants.  )

## ORDER

Before the Court is the Plaintiffs' Motion for Summary Judgment [Doc. No.91]. Each

defendant has filed separate responses, and Plaintiffs have filed reply briefs.[1]

Background:

Plaintiff Pioneer Telephone Cooperative, Inc.("Pioneer") maintains for its employees a

benefit plan, the Pioneer Telephone Employee Welfare Benefit Plan (the "Plan") , which is a benefit

plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U. S. C.

§ 1001, *et seq.* Pioneer is also the Plan administrator.

Defendant Yonevea Terry ("Ms. Terry") was a Pioneer employee covered by the Plan;

pursuant to its provisions, her dependents were also covered. Defendant Steven Terry is Ms. Terry's

son. Defendant James E. Dunn is an Oklahoma City attorney; his law firm, James E. Dunn &

---

[1]Each defendant has also filed a summary judgment motion. Those motions will be
addressed in a separate order.

Associates, PLLC, formerly known as James E. Dunn & Associates, PC, is also named as a defendant (collectively, the "Dunn Defendants").

Pioneer and the Plan bring this action for injunctive and equitable relief.  Their claims are based on the Plan's payment of $102,312.59 in medical expenses incurred by Steven Terry, who received Plan coverage because he was Ms. Terry's dependent at the time the expenses were incurred.  Briefly stated,  Plaintiffs contend that a third party paid $125,000 to settle Steven Terry's claim for the same injuries for which the Plan paid medical expenses.  Plaintiffs contend that, pursuant to the Plan's subrogation provisions, Ms. Terry was obligated to ensure that the Plan was reimbursed for the expenses it paid; however, she did not take action to ensure reimbursement, and the Plan has never been reimbursed.   Plaintiffs also argue that, to the extent the settlement proceeds were partially received by the Dunn Defendants and Steven Terry, they are also obligated to ensure reimbursement to the Plan.  As more fully discussed herein, Plaintiffs contend that each Defendant owed a fiduciary duty to the Plan to ensure it was reimbursed from the settlement up to the amount of the claims it paid.  Plaintiffs assert equitable remedies, including a constructive trust, to allow the Plan to recover that amount.

Each defendant argues that the Plan subrogation clause was not triggered by the facts. Although each asserts a different defense, in effect they argue that the Plan is not entitled to any reimbursement of the $102,312.59 in medical expenses paid on behalf of Steven Terry. Furthermore, Ms. Terry asserts a counterclaim against the Plan, alleging that it violated ERISA when, after no reimbursement was received,  it suspended her employment and offset her new medical claims against the amount it claimed was owed as a result of the subrogation clause.   Ms. Terry contends that these actions violate ERISA because they constitute retaliation against her for

the exercise of her ERISA rights.

In a June 14, 2007 Order [Doc. No. 62], the Honorable David L. Russell, to whom this case was originally assigned, granted Plaintiffs' motion to bifurcate Ms. Terry's counterclaim based on the Plan's exercise of an offset. In doing so, he determined that, because the wrongful offset claim involves an interpretation of Plan provisions, that claim would be decided upon the Court's review of the administrative record and that no discovery would be permitted on that claim. *See* Order [Doc. No. 62] at pp. 4-5. Judge Russell further determined that both Plaintiffs' claims and Ms. Terry's counterclaim for retaliatory suspension of her employment are subject to discovery and a nonjury trial. *Id.* at p. 4. Judge Russell also advised the parties that those claims would be tried first in a nonjury proceeding; following the entry of findings of fact and conclusions of law on those claims, he would decide Ms. Terry's wrongful offset claim upon his review of the administrative record. *Id.* at p. 5.[2]

Plaintiffs now seek summary judgment on the claims asserted against all defendants and on Ms. Terry's counterclaim alleging retaliatory suspension of her employment.

Summary judgment standard:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)*; Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, the

---

[2]Judge Russell's rulings are adopted herein. The Court will follow the procedure announced by Judge Russell. Therefore, subject to the rulings on the summary judgment motions filed by each party, the Court will conduct a nonjury trial on all claims except the wrongful offset claim, which will be determined from a review of the administrative record.

nonmoving party must offer more than a "mere scintilla" of evidence; the evidence must be such that the finder of fact could return a verdict in his favor. *Id.* The facts and reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *MacKenzie v. City & County of Denver*, 414 F. 3d 1266, 1273 (10th Cir. 2005).

The record before the Court:

The parties' arguments reflect that the issues presented are primarily legal and depend upon the interpretation of the Plan language as well as the application of ERISA rules and requirements to the facts of this case. The parties have submitted extensive briefs and exhibits in support of their respective arguments. Having reviewed the material submitted, the Court finds the record establishes that most of the material facts are undisputed; although one or more of the defendants purport to dispute some factual matters, the record reflects most of the pertinent facts cannot reasonably be disputed.

The parties agree that Ms. Terry was employed by Pioneer as a customer service representative in its Apache, Oklahoma office. During the time period relevant to this case, she was one of three full-time employees at that location. Ms. Terry was a participant in the Plan and, as a result, she and her dependents received coverage for medical expenses.

On May 12, 2005, Ms. Terry's 17-year-old son, Steven Terry, was seriously injured in an automobile accident. Because he was Ms. Terry's dependent, he was covered under the Plan. Steven Terry was hospitalized and later required rehabilitation and physical therapy. It is not disputed that the Plan paid $102,312.59 for his expenses related to the injuries sustained in the accident.

On or about May 23, 2005, Ms. Terry and her husband retained an attorney, William Todd

McKee, to investigate and prosecute a personal injury claim based on Steven Terry's injuries in the accident. On that date, they executed a contingency fee agreement with McKee. Plaintiffs' Ex. 2. It is not disputed that the claim was governed by the Oklahoma Governmental Tort Claims Act ("GTCA") because the tortfeasor was driving a motor vehicle owned by a local school district and was acting in the scope of his employment at the time of the accident. McKee initiated contact making demand for recovery of claims related to the accident. *See* Plaintiffs' Ex. 8.

On June 13, 2005, McKee sent to Pioneer's Benefits Department a letter acknowledging the Plan's subrogation rights. Plaintiffs' Ex. 4. The letter contained a reference line "Re: Yonevea Terry Subrogation," and states in pertinent part:

> Pursuant to our telephone conversation of today's date, please allow this letter to serve as my agreement to protect your company's subrogation rights. In this regard, I will gladly place a lien stamp on my file. At such time as this case is resolved, I will contact you in order to determine your interest, before distributing any funds to my client. This is not a personal guarantee by William T. McKee to pay your subrogation interest, but is an assurance that your interest will receive priority.

Plaintiffs' Ex. 5 (emphasis in original). Upon receipt of this letter, the Plan contacted McKee and advised that, pursuant to the Plan subrogation provisions, Ms. Terry would also be required to execute a subrogation agreement or acknowledgment of the Plan's subrogation Rights. Plaintiffs' Ex. 6. Ms. Terry then signed the same letter previously prepared and executed by McKee, and he sent the signed copy to the Plan via facsimile transmission. Plaintiffs' Ex. 6.

The Plan contains a subrogation clause. *See* Plan, "Section C. Subrogation and Right of Reimbursement," submitted as Plaintiffs' Ex. 1, Bates Stamp pp. 0056-0058.[3] The clause provides

---

[3]When referring to Plaintiffs' summary judgment motion exhibits which contain multiple pages, the Court will cite the Bates Stamp numbers appearing on the exhibit page.

in pertinent part:

> It is agreed that in the event a participant receives any benefits arising out of injury, illness, sickness, condition, disability, accident, or incident for which the participant has, may have or asserts any claim or right to recovery under any theory of law or equity, tort, contract, statute, regulation, ordinance or otherwise against any source including third parties, insurers, insurance, uninsured motorist coverage, etc. then any payment or payments by the Plan for such benefits shall be made on the condition and with the agreement and understanding that the Plan will be reimbursed by the participant and his/her representatives, attorneys, agents, and all persons acting for, on behalf of, in concert with, or at the direction of the participant ("Obligated Party") to the extent of, but not exceeding the amount or amounts received by the participant under any theory of law or equity from such source by way of any agreement, settlement, judgment or otherwise.  Any such amounts received by, on behalf of, with the consent of, or at the direction of the Obligated Party, or to which the Obligated Party is entitled to receive or direct payment, or over which the Obligated Party exercises any control, is deemed and shall be considered and treated as an asset of the Plan.

Plan, Plaintiff's Ex. 6, pp. 0056-57 (emphasis added).  The subrogation clause further provides:

> The Obligated Party shall do nothing to prejudice the rights of the Plan to such reimbursement and subrogation.  This includes attempts by the Obligated Party to have payments characterized as non-medical in nature...or to direct or consent to have payments made to others (e.g., to or on behalf of relatives, attorneys, agents, representatives or friends).

*Id.*, p. 0057.  The Plan also provides:

> Additionally, the participant shall be fully responsible for the actions of his/her Obligated Party, dependents, representatives, attorneys, agents, and all persons acting for, on behalf of, in concert with, or at the direction of the participant regarding the Plan or the participant's obligations described herein.  The participant shall be responsible to ensure that such persons cooperate and comply with the participant's obligations herein.

Plan, p. 0058.    The provisions also authorize the Plan to require a participant to execute a

Reimbursement Agreement[4] and to withhold payment of medical expenses until that written

---

[4]Defendants take issue with the use of the phrase, "Reimbursement Agreement"; however, the Plan expressly utilizes that phrase in reference to the Plan's right to require a participant's written acknowledgment of the Plan's subrogation rights.  Plan, at p.0057.  The Court finds that the

acknowledgment is received.  *Id.*, p. 0057.  If a participant fails to ensure that the Plan is reimbursed

for any recovery subject to the subrogation clause, the Plan is  authorized to offset the recovery

amount against future medical expenses.   Plan, p. 0058.

Pursuant to the subrogation clause, the Plan submitted to Ms. Terry a Reimbursement

Agreement, dated June 3, 2005.  Plaintiffs' Ex. 3.  The Plan  notified her that it would not pay

Steven Terry's expenses until it received an executed copy of the same.     Although Ms. Terry

executed the separate June 13, 2005 letter prepared by attorney McKee and acknowledging the

Plan's subrogation rights, *see* Plaintiffs' Ex. 6, she did not sign the Reimbursement Agreement sent

to her by the Plan until on or about August 2, 2005; according to Ms. Terry, she signed the

agreement at the direction of Defendant Dunn.  Deposition of Yonevea Terry ("Ms. Terry dep.")[5],

pp. 80-85.  The Reimbursement Agreement signed by Ms. Terry was transmitted to Plaintiffs by

Dunn, and is submitted as a part of Plaintiffs' Ex. 20.

 Steven Terry's eighteenth birthday was June 3, 2005.   Prior to his birthday, the Plan had

paid $92,329.92 in medical expenses on his behalf; after his birthday, it paid an additional

$9,982.67.

The Plan provides that a participant's dependent is covered until he reaches the age of nineteen.

Plan, p. 0006.  Accordingly, Steven Terry continued to be eligible for Plan coverage as Ms. Terry's

dependent until his nineteenth birthday.

On or about August 2, 2005, Ms. Terry, her husband,  and Steven Terry met with Defendant

_____

phrase is appropriate.

[5]Plaintiffs submit the depositions of Ms. Terry, Steven Terry, and Dunn without identifying
the same by exhibit number.  Accordingly, references to their deposition testimony are identified
by citing the deposition and the appropriate page numbers of the transcripts.

Dunn regarding the GTCA claim arising from the accident and Steven Terry's injuries. Plaintiffs' Ex. 12. At that time, Steven Terry executed a contingency fee agreement with Dunn to represent him regarding his tort claim. Plaintiffs' Ex. 11. Dunn wrote to McKee to advise him that Steven Terry had reached the age of majority and had decided to retain Dunn to represent him in connection with the GTCA claim. Plaintiffs' Ex. 13.

Ms. Terry recalls attending two conferences with Dunn; during her deposition, she testified that she was uncertain of the exact dates, but agreed that one occurred on August 2, 2005. Ms. Terry dep. at pp. 67-69. Ms. Terry testified that, during her meeting with Dunn, she discussed with him the Plan's subrogation rights and the Reimbursement Agreement previously submitted to her; according to Ms. Terry, Dunn advised her to sign the agreement and return it to the Plan. Ms. Terry dep., pp. 80-85. On August 2, 2005, Dunn wrote to Lisa Barnes, Pioneer's Employee Benefits Division Manager, to advise her that his firm had been retained to represent Steven Terry in connection with his claim for injuries sustained in the May 12 accident. Plaintiffs' Ex. 16. His letter contained the reference line "Steven Terry Subrogation," and asked Ms. Barnes to telephone him to "discuss Pioneer Telephone Cooperative, Inc's subrogation interest in this matter." *Id.* Ms. Barnes responded by letter of August 5, 2005. Plaintiffs' Ex. 19. In her letter,[6] Ms. Barnes advised Dunn that the letter had been sent to Ms. Terry in June, and that no signed copy had been returned; she also advised him that, until Ms. Terry's signed letter was received, the Plan could not pay claims for Steven Terry's accident. *Id.* Ms. Barnes enclosed a copy of the Plan's subrogation policy.

Dunn testified that he did not have a "specific memory" regarding his discussion with Ms.

---

[6]Dunn emphasizes the fact that Ms. Barnes did not telephone him as he requested; however, the Court finds that fact irrelevant because Ms. Barnes responded by letter.

Terry regarding the Plan's subrogation rights, Ms. Terry's questions to him about the Reimbursement Agreement she had been asked to sign, or his advice to her regarding these matters; however, she signed the letter and had it delivered to his office.   Dunn dep.,  p. 105, lines 5-25; p. 106-08.   According to Ms. Terry, she gave the executed agreement to Steven Terry to deliver to Dunn; Dunn agrees that Steven Terry delivered the agreement to him.   Dunn dep., p. 106.     On August 5, 2009, Dunn sent a certified letter to Ms. Barnes, enclosing the Reimbursement Agreement, executed by Ms. Terry, and  dated June 3, 2005.  *Id.*  A copy of the Reimbursement Agreement is submitted as   Plaintiffs' Ex. 20.   It states:

> This letter is to acknowledge the subrogation rights of Pioneer Telephone Coop., Inc. Employee Benefit Plan.  I ask that the bills concerning the accident of May 12, 2005, in which  my son, Steven Terry, was involved, be paid by Pioneer Telephone Employee Benefits Plan.
>
> I agree to the Plan being subrogated to any recovery or right against the third party. The Plan will be subrogated only to the extent of Plan benefits paid or to be paid because of injury.

Plaintiff's Ex. 20, p. 0179.

The parties do not dispute that Dunn negotiated a settlement pursuant to the maximum limits of the  GTCA;  a $125,000 settlement check jointly payable to Dunn and Steven Terry was sent to Dunn on or about October 6, 2005.  Plaintiffs' Ex. 28.   According to Dunn, he deposited the same in his client trust account, deducted his $20,850.00 contingency fee, sent  McKee $1,500.00 for his fee,  and  provided Steven Terry with a check for the balance of $92,250.00; Steven Terry executed a "settlement statement" acknowledging his receipt of the same and showing the amounts paid to Dunn, McKee, and Steven Terry.  Plaintiffs' Ex. 32.

Steven Terry deposited his check into a bank account he jointly owned with Ms. Terry. Plaintiffs' Ex. 34- 35; Ex. 67, p. 0417.  The account is styled "Steven Terry or Yonevea Terry."

Plaintiffs' Ex. 66-67.

It is not disputed that Ms. Terry, Dunn, and Steven Terry did not notify the Plan of the receipt of the settlement check at that time; nor did Ms. Terry, Dunn, or Steven Terry advise the payor that the Plan had a subrogation interest in the settlement or take action to ensure that the Plan received the portion of the settlement to which it asserted subrogation rights.   The record reflects that, on August 18, 2006, Ms. Barnes wrote to Dunn to inquire about the status of any settlement regarding the May 12, 2005 accident, noting that the Plan had not received any reimbursement for the claims it paid for Steven Terry's covered Plan expenses; a copy of the letter was also sent to Ms. Terry.  Plaintiffs' Ex. 37.   No response was received.  A handwritten notation on the letter reflects that Barnes or someone then verbally asked  Ms. Terry about the status of the settlement, and Ms. Terry stated she would have the attorney call.   Plaintiffs' Ex. 37, handwritten note.   No telephone call was received.

On September 27, 2006, Ms. Barnes sent the August 18, 2006 letter to Dunn via facsimile transmission, with a cover page noting, "There has been no response to this letter of 8-18-06.  Please advise on the status of this claim." Plaintiffs' Ex. 38.  No response was received.  A handwritten note  initialed "LB" states that, on October 26, 2006, the writer telephoned Ms. Terry, who said the case  "was kinda, sorta settled, and she said she would have the attorney call us.  She would not talk to me then."  Plaintiffs' Ex. 39.

The  Plan's attorney, Harold Logsdon, wrote to Dunn on October 30, 2006 and again requested information regarding the status of the claim.  Plaintiffs' Ex. 40.  The file reflects no response was received to that inquiry, as the Plan notified Ms. Terry on November 16, 2006 of its intent to exercise its right to suspend Plan benefits for the purpose of offsetting  the amount paid on

behalf of Steven Terry, for which no reimbursement had been received, against future medical benefits claims submitted by Ms. Terry or her dependents.  Plaintiffs' Ex. 41.   The letter advised Ms. Terry of her right to appeal the decision to suspend future benefits to offset the amount owed to the Plan pursuant to its subrogation rights.

Approximately two weeks later, on November 27, 2006, Dunn  delivered a letter to the Plan's current attorneys of record.  Plaintiffs' Ex. 42.  Therein, he stated his position that, under Oklahoma law, Steven Terry was not obligated to reimburse the Plan.  He also stated that he did not receive the August 18, 2006 letter from Ms. Barnes or the September 27, 2006 facsimile transmission of that letter.  He also stated he was enclosing a copy of his letter for "Mrs. Terry's appeal pursuant to the benefit plan."  *Id.*, p. 0209.

The record reflects that it is undisputed that Steven Terry utilized the $92,250.00 settlement deposited in the joint account in part to pay a balance owed by Mr. and Ms. Terry to several creditors.  It is not disputed that he paid $14, 705.87 in debts owed by Ms. Terry and her husband.  Plaintiffs' Ex. 61, pp. 0316-0317; Ms. Terry dep., pp. 96, 161, 167; Steven Terry dep., p. 59.  Ms. Terry accepted that payment. Ms. Terry dep., pp. 129-30; 161-62; Plaintiffs' Ex. 61, pp. 316-17; Plaintiffs' Ex. 64, p. 396.  Steven Terry also used the settlement funds to purchase a mobile home and three motor vehicles.  Steven Terry dep., pp. 62-67; Ms. Terry dep., pp. 176-85.

Ms. Terry testified that, although she knew she had the authority to withdraw funds from the joint account in which Steven Terry deposited the $92,250.00 settlement check, she did not do so; she also denied that she intended to use that money.  She admitted, however, that Steven Terry paid more than $14,000 in obligations she and her husband owed to creditors.  Steven Terry obtained a cashier's check from the bank for  $12,870.08,  and used that check to pay off the balance of a car

loan for Ms. Terry and a loan on a truck owned by Mr. Terry.  Steven Terry dep., p. 59, lines 8-18;

p. 60, lines 24-25, p. 61, lines 1-12.    Steven Terry also obtained cashier's checks to pay three

consumer loans owed by Ms. Terry.  *Id.*, p. 59, lines 8-18.   When asked why he paid his mother's

debts, Steven Terry testified, "Because I wanted to.  There is no other explanation."  Steven Terry

dep., p. 59, lines 19-24.  He denied that she asked him to pay these debts; he also denied he felt he

owed her for the time and money she had expended during his hospitalization and other medical

treatment; he testified that he did not believe he owed her anything, "as her being my mom, she has

– she almost has to do that stuff for me."  *Id.,* p. 60, lines 12-19.  Ms.  Terry denied that she asked

Steven to pay any of these debts, although she admitted he told her he planned to pay her debts;  he

obtained from her the information regarding the amounts owed and the creditors to whom payment

was to be made.  Ms. Terry dep., p. 130-132.

It cannot be disputed that Ms. Terry knew Steven Terry received the $92,250 settlement and

that he used part of the settlement proceeds  to pay off her debts.  However, she admitted she did not

inform the Plan that he had received the settlement, and testified she "figured his attorney would

have done that."  *Id.*  at p. 132, lines 7-19.  When asked why she did not contact the Plan to inform

it of the settlement, she responded, "I don't know."  *Id.*, lines 20-21.

It is not disputed that Steven Terry used the settlement funds to purchase a mobile home for

approximately $20,000, a truck and a car for his own use, and a car for his girlfriend.  He also

donated approximately $2,000 to an Apache day care center attended by his daughter; a local

newspaper advertisement stated the day care center's appreciation for the large donation, and

included his parents' names as well as his own as donors.

Steven Terry testified that he could not recall whether he ever discussed the amount of the

settlement with Ms. Terry,  his father, or anyone other than Dunn; he denied that Ms. Terry expressed dissatisfaction with the settlement or discussed with him how the money should be distributed.  Steven Terry dep., p. 46, lines 11-25; p. 47, lines 1-6.  Steven Terry denied that he had any discussions with his parents or his attorneys regarding the subrogation rights of the Plan.  Steven Terry dep., p. 53, lines 21-25, p. 54, lines 1-4.  By the date of his January 10, 2008 deposition, he had spent the balance of his share of the settlement; other than the purchases and payment of Ms. Terry's debts discussed above, he did not specifically recall how the money was spent, but testified that he used some of it to gamble at a casino.  *Id.*, pp. 67-68.

Ms. Terry  believed it was unfair that the Plan  sought reimbursement for the $102, 312.59 it paid on behalf of Steven Terry, and she did not want to sign the Reimbursement Agreement for that reason.  Ms. Terry dep., p. 49.  She signed the Reimbursement Agreement only because the Plan required that it be executed before it would pay Steven Terry's medical expenses.  *Id.*, p. 47.  She understood, however, that the funds used to pay his expenses were Plan funds and that, when the Plan was reimbursed as a result of subrogation, the reimbursement went to the Plan fund and was used to satisfy all Plan participants' claims.  Ms. Terry dep., 93, lines9-25; p. 94, lines 1-7.

The record establishes that Ms. Terry, Steven Terry, and Dunn never initiated contact with the Plan to inform it of the $125,000.00 settlement; at no time did any of the defendants advise the tortfeasor of the Plan's subrogation claim or take any action to ensure that the Plan was reimbursed for the $102,312.59 in medical expenses it paid for the claims incurred by Steven Terry as a result of the accident.

The subrogation clause:

The parties' respective arguments establish that the interpretation of the subrogation clause

is a primary issue to be determined, especially the meaning of the term, "Obligated Party." Accordingly, the Court will first address that issue.

Plaintiffs, of course, contend that the clause covers not only Ms. Terry as the Plan participant, but extends to the other defendants who are "Obligated Parties" as defined by the Plan. Steven Terry contends he is not an "obligated party," arguing the clause does not extend to him and, alternatively, because he did not execute a Reimbursement Agreement. He argues Ms. Terry, as the participant, is the only "Obligated Party." Dunn also argues Ms. Terry is the only "Obligated Party;" he also contends that , because he did not represent Ms. Terry but represented Steven Terry only after Steven reached his eighteenth birthday, Steven Terry and Dunn cannot be obligated parties. Dunn also agrees with Steven Terry and Ms. Terry that the settlement funds at issue were recovered directly by Steven Terry after he reached the age of eighteen, and Ms. Terry did not receive those funds. Ms. Terry, while acknowledging that she is an "Obligated Party," under the Plan, nevertheless contends that she had no obligation regarding subrogation because she did not receive the settlement; she contends that, because it was received by Steven Terry after he pursued a claim following his eighteenth birthday, she had no control over the funds and no responsibility under the Plan.

When the Court interprets an ERISA plan, it "examines the plan documents as a whole and, if unambiguous, construes them as a matter of law." *Administrative Committee of Wal-Mart Associates Health and Welfare Plan v. Willard*, 393 F. 3d 1119, 1123 (10th Cir. 2004)(citing *Chiles v. Ceridian Corp.*, 95 F. 3d 1505, 1511 (10th Cir. 1996)). "In doing so, we give 'the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Id.* (quoting *Blair v. Metro. Life*

*Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992)).

Having reviewed the entire subrogation clause, the Court concludes that the term "Obligated Party" is not ambiguous.  The definition of an "Obligated Party" first appears in the Plan as follows:

> [A]ny payment or payments by the Plan for such benefits shall be made on the condition and with the agreement and understanding that <u>the Plan will be reimbursed by the participant and his/her representatives, attorneys, agents, and all persons acting for, on behalf of, in concert with, or at the direction of the participant ("Obligated Party") to the extent of, but not exceeding the amount or amounts received by the participant under any theory of law or equity from such source by way of any agreement, settlement, judgment or otherwise.</u>

Plan, p. 0056-0057 (emphasis added).   Contrary to the defendants' arguments, the Court finds that, pursuant to this definition,  Ms. Terry is not the only  "Obligated Party."

Initially, the Court observes that, if  "Obligated Party" meant only the Plan participant, there would be no need to include language defining its scope.  Instead, the Plan would simply have been limited to the Plan participant's obligations regarding subrogation.  That is not what the Plan states. The Plan expressly defines Obligated Party to include the participant as well as "his/her representatives, attorneys, agents, and all persons acting for, on behalf of, in concert with, or at the direction of the participant."  Plan, p. 0057.

Furthermore, when interpreting the terms of the subrogation clause, the Court must examine all its provisions;   the clause, read in its entirety, is not, as some defendants contend, ambiguous. In fact, the subrogation clause specifically and expressly extends the obligation to ensure subrogation to all persons acting on behalf of or in concert with the participant.   Additionally, the subrogation clause contains at least 15 additional references to the term, "Obligated Party" or "Obligated Parties."   If that term was limited to the participant, these references would be

unnecessary.  Furthermore, the subrogation clause distinguishes certain obligations and rights of the Obligated Party or Parties from those of the participant.    For example, it provides that "the participant shall be fully responsible for the actions of his/her Obligated Party;" that provision would be unnecessary if the participant and the Obligated Party are the same person.

In summary, the Court concludes that the subrogation clause language is not ambiguous.  A reasonable person in the position of the plan participant would have understood the words "Obligated Party" to include Ms. Terry and certain others; specifically, a reasonable person in the position of the plan participant would take the words to mean Ms. Terry and her "representatives, attorneys, agents, and all persons acting for, on behalf of, in concert with, or at the direction of" Ms. Terry.  Plan, p. 0057.  Therefore, Ms. Terry, Steven Terry, and Dunn  may satisfy the definition of an "Obligated Party" under the Plan.  To the extent Plaintiffs' motion is based on that contention, the motion is granted in part, and Defendants' arguments to the contrary are rejected.

The Court also agrees with Plaintiffs' contention that one who satisfies the definition of  an "Obligated Party" under the terms of this Plan would have a fiduciary duty to the Plan based on the subrogation obligations in  the Plan.  As Plaintiffs point out, they do not contend that Defendants are fiduciaries for all purposes; rather, their contention is limited to the claim that they became fiduciaries only as to the settlement amount, as that amount became a Plan asset pursuant to the subrogation provisions.   ERISA provides a  process for establishing entitlement to relief under § 1132(a)(2): 1) the defendant must be a "fiduciary" as defined by 29 U. S. C. § 1002(21)(A); and 2) he or she must have violated the fiduciary standards of ERISA.  If these factors are present, then the individual is liable for the relief authorized by 29 U. S. C. § 1109(a), and may be sued under § 1132(a)(2).

A person is a fiduciary under ERISA with respect to a plan "to the extent (i) he ...exercises

any ...authority or ...control respecting management or disposition of its assets."  29 U. S. C.

§ 1002(21)(A).   The relief available for breach of a fiduciary duty is described in § 1109(a):

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

29 U. S. C. § 1109(a).  An action to recover ERISA plan assets may be brought by a Plan fiduciary.

29 U. S. C. § 1132(a)(2).  As administrator of the Plan, Plaintiffs have a fiduciary duty to Plan

participants to protect the Plan assets.  29 U. S. C. § 1104(a)(1)(A) and (D).

As Plaintiffs point out, ERISA does not contain an express definition of a plan "asset."  Nor

has the Tenth Circuit provided an express definition in this context.   However, as Plaintiffs point

out, the Department of Labor has applied the following definition:

> Apart from participant contributions, applying ordinary notions of property rights, the assets of a welfare plan generally include any property, tangible or intangible, in which the plan has a beneficial ownership interest.  The identification of plan assets therefore requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved.

ERISA Opinion Letter 92-24A, p. 2 (November 6, 1992).  Defendants do not contest this definition.

Accordingly, the Court agrees with Plaintiffs that, where an ERISA plan pays benefits to participants

or their dependents pursuant to a subrogation clause in the plan, the funds covered by the

subrogation provision satisfy the definition of plan assets.  Furthermore, the language of the Plan

in this case supports that interpretation, as the Plan expressly states  the subrogation clause is

designed to protect Plan assets:

> The Plan's subrogation and reimbursement rights described herein are essential to assure the equitable character of the Plan and its financial soundness, and to ensure that funds are recouped and made available for the benefit of all of the participants

and beneficiaries collectively.

Plan, Plaintiffs' Ex. 1, p. 0058.

The Court thus concludes that, under the subrogation clause provisions in the Plan, one who qualifies as an "Obligated Party" has a fiduciary duty with regard to the amounts at issue in subrogation.   In order to show that each Defendant is an "Obligated Party" having a fiduciary duty to the Plan, however, Plaintiffs must show that each satisfies the definition of an "Obligated Party." The determination of their obligation and potential liability as fiduciaries is a mixed question of fact and law.  *Coldesina v. Estate of Simper*, 407 F. 3d 1126, 1131 (10th Cir. 2005).  According to the Tenth Circuit, "parties controlling plan assets are *automatically* in a position of confidence by virtue of that control, and as such they are obligated to act accordingly."  *Id.*, at 1132 (emphasis in original).  That determination in this case depends on whether each satisfies the definition of an "Obligated Party" under the Plan.

 Ms. Terry:

As noted above, the express language of the Plan provides that Ms. Terry, as a Plan participant,  is an "Obligated Party" as defined by the subrogation clause.  Plan, Plaintiffs' Ex. 1, p. 0057.  In addition,  Ms. Terry acknowledged her subrogation obligations under the Plan in two separate documents.  First, she executed the June 13, 2005 letter prepared by McKee; the letter expressly acknowledged  the Plan's subrogation rights with respect to any third party proceeds received as a result of Steven Terry's injuries.  Plaintiffs' Ex. 6.  Second, on or about August 5, 2005, she executed the June 3, 2005 Reimbursement Agreement acknowledging  her obligation to reimburse the Plan up to the amounts it paid for medical expenses incurred by her dependent, Steven Terry.  Plaintiffs' Ex.20, p. 0179.   That she understood her obligations is further evidenced by her

questions, expressed to Dunn, regarding her subrogation duties, including but not limited to her concern about the impact her failure to comply with those obligations might have on her job. Ms. Terry dep., pp. 70; 80-83; 85-86. According to Ms. Terry, she expressly asked Dunn's advice regarding subrogation. *Id.* Although Dunn testified that he did not recall precisely what he told her, he recalled they discussed subrogation. Dunn dep., p.88-89. He also recalled that he told her the subrogation clause did not apply to Steven Terry. *Id.*, p. 88, lines 18-25. Ms. Terry recalled that Dunn advised her that subrogation would not apply because state and federal funds were involved in Steven Terry's settlement. Ms. Terry dep, p. 81. According to Ms. Terry, Dunn also told her that they would "cross that bridge" when necessary. *Id.*, p.82.

The record clearly reflects Ms. Terry did not want to comply with the Plan's subrogation rights, and she believed it was unfair; she so testified several times. It is also apparent that Ms. Terry believed the Plan's requirement that she execute the Reimbursement Agreement before it would pay Steven Terry's medical claims was unfair. Ms. Terry dep., p. 80. That she disagreed with this requirement is irrelevant to the validity of the agreement she signed, as the Tenth Circuit has approved reimbursement agreements if the Plan provides for their use. *See, e.g., Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund*, 410 F. 3d 1194 (10th Cir. 2005).[7]

---

[7]In *Gorman*, the Circuit found a reimbursement agreement unenforceable because the Plan did not authorize the use of such agreements. 410 F. 3d at 1199-1200. However, in reaching that conclusion, it noted that such agreements are enforceable where the Plan provides for their use. *Id.* (citing *Alves v. Silverado Foods, Inc.,* 6 F.App'x 694 (10th Cir. 2001)(unpublished opinion), *Willard, supra,* and *Kress v. Food Employers Labor Relations Ass'n*, 391 F. 3d 563 (4th Cir. 2004)). As Plaintiffs point out in their reply to Ms. Terry's response, *Gorman* rejected a reimbursement agreement because the scope of that agreement exceeded that which was authorized by the plan at issue. The Reimbursement Agreement in this case does not exceed the Plan's provisions. *See* Plan, p. 0057 ("As further security for the Plan's rights to such reimbursement, the payment of benefits may be withheld until the Obligated Party has executed a Reimbursement Agreement.").

That she did not want to comply with the Plan's subrogation rights does not render those rights unenforceable.  The issue is whether the subrogation clause obligates her to reimburse the Plan under the facts presented by this case.  Notwithstanding her knowledge of the subrogation clause and her execution of the Reimbursement Agreement, Ms. Terry now argues the subrogation clause is inapplicable to her  because she did not receive the settlement proceeds.  She contends that, because Steven Terry retained a new lawyer when he reached 18 years of age,  pursued a GTCA claim in his own name, and received settlement funds, the subrogation obligation is inapplicable.

Ms. Terry's position is contrary to the express Plan provisions.  According to the subrogation clause in the Plan, "the participant shall be fully responsible for the actions of his/her...<u>dependents</u>" and "shall be responsible to ensure that such persons cooperate and comply with the participant's obligations herein."  Plan, p. 0058 (emphasis added).   It is not disputed that the Plan paid over $102,000 in medical expenses incurred by Steven Terry.  He was not an employee or participant in the Plan, and his expenses were covered by the Plan solely because he was Ms. Terry's dependent.  Furthermore, he continued to be eligible for Plan coverage as her dependent until he reached the age of 19.  Plan, p. 6.

Ms. Terry cannot reasonably suggest otherwise.  She argues that her obligation is excused by *Member Services  Life Ins. Co. v. American Natl. Bank,* 130 F. 3d 950 (10th Cir. 1990).  As Plaintiffs point out, however, *Member Services* is factually distinguishable.  In *Member Services,* the ERISA plan administrator amended  the plan language and attempted to apply it retroactively to a claim that would not have been subject to the plan's subrogation provisions.  130 F. 3d at 952-53.

In this case, there was no amendment of the subrogation clause or other attempt to retroactively alter the Plan's provisions.

Ms. Terry also argues, however, that the subrogation clause does not expressly include subrogation rights based on a dependent's recovery of a tort settlement.  The Court disagrees.  The language of the Plan regarding subrogation  extends to:

> ... the amount or amounts received by the participant under any theory of law or equity from such source by way of any agreement, settlement, judgment or otherwise.  Any such amounts received by, on behalf of, with the consent of, or at the direction of the Obligated Party, or to which the Obligated Party is entitled to receive or direct payment, or over which the Obligated Party exercises any control, is deemed and shall be considered and treated as an asset of the Plan.

Plan, p. 0057.  The Plan further provides that an "Obligated Party shall do nothing to prejudice the rights of the Plan to such reimbursement and subrogation," including attempts "to direct or consent to have payments made to others (e.g., to or on behalf of relatives, attorneys, agents, representatives or friends.)."  *Id.*  To the extent that a dependent is an Obligated Party, the subrogation clause clearly extends to them.

Ms. Terry next contends that she had no control over the settlement funds received by her son.  She argues she did not direct or consent to the settlement of the GTCA claim.  Although it is undisputed that Steven Terry  resided with his parents throughout the relevant time period, Ms. Terry testified that she did not discuss the settlement with him, nor did she express an opinion regarding the potential settlement, the amount, or how the proceeds would be distributed.[8]  She admits, however, that she knew he received a settlement, that he deposited the $92,250 settlement

---

[8]According to Dunn, the $125,000 GTCA settlement offer had been made before his second meeting with Ms. Terry, Mr. Terry, and Steven, and they discussed the settlement offer at that meeting.  Dunn dep., p. 87.

check in their joint savings account,  and that she was authorized to withdraw funds or write checks

from the account.  Ms. Terry dep., pp. 174-176.  Despite her knowledge and authority,  she denies

she exercised any control over the account.  Ms. Terry also admits that Steven Terry used the

settlement funds to pay  more than $14,000 in personal obligations owed by Ms. Terry and her

husband and that she knew he intended to do so because he had to obtain from her the amounts owed

and the identities of the creditors.  *Id.*, p. 129, lines 22-25; pp. 130-132.

Notwithstanding her knowledge of the settlement and the distribution of the funds,  Ms.

Terry never notified the Plan that the third-party claim had been settled.  She believed Steven

Terry's attorney, Dunn, should have notified the Plan. Ms. Terry dep., p. 150-151.  In fact,

information regarding the settlement was not received by the Plan until more than one year after

Steven Terry deposited the $92,250 in settlement proceeds in the joint account;  the information was

provided only after the Plan contacted its attorney.  In the interim, the Plan had written two letters

to Dunn inquiring about the status of any settlement[9], and  telephoned Ms. Terry, who reported only

that the matter had "kinda sorta" settled, and said she would have the attorney contact the Plan.[10]

Ms. Terry's claim that she lacked knowledge of the settlement is simply not supported by

the record.

Also unpersuasive is her contention that she had no control over the settlement funds

deposited in the joint account.  That she did not personally withdraw money from the account is not

dispositive of the issue.  She had authority and the ability to exercise control over the funds in the

---

[9]In a November 27, 2006 letter to Plaintiffs' counsel, Dunn indicated he had no record of receiving the August  letter from Plaintiffs or  the subsequent copy sent to him by facsimile. Plaintiffs' Ex. 42.

[10]Ms. Terry testified she did not recall this conversation. Ms. Terry dep., p.137.

account. *See In re Estate of Greer*, 128 P. 3d 1104, 1107 (Okla. Civ. App. 2006). The Plan expressly provides that she cannot avoid her subrogation obligations by consenting to have payments made to others, including relatives. Plan, p. 0057.

The Court concludes that the undisputed facts in the record establish that, as a matter of law, Ms. Terry is an Obligated Party as defined by the Plan's subrogation clause and, as a result, had a fiduciary duty to ensure that the Plan received reimbursement from the settlement proceeds up to the amount of medical claims paid by the Plan for Ms. Terry's dependent, Steven Terry. Accordingly, Plaintiffs' summary judgment motion is granted to that extent.

Steven Terry:

Plaintiffs argue that Steven Terry is also an Obligated Party under the subrogation agreement because he acted in concert with Ms. Terry, with her consent, or at her direction, as provided in the Plan's subrogation clause. They contend that, as a result, he had a fiduciary obligation to reimburse the Plan for the amounts it paid on his behalf.

In response, Steven Terry denies that obligation, arguing that he never signed, nor was he asked to sign, a Reimbursement Agreement. The Court finds that argument unpersuasive, as the terms of the subrogation clause do not limit Obligated Parties to those who sign reimbursement agreements. Instead, Steven Terry is an Obligated Party if he acted in concert with Ms. Terry, with her consent or at her direction, or on her behalf. Plan, p. 0057. Thus, the question is whether the facts establish any of those conditions.

It is apparent from the record that Steven Terry exercised control over the settlement proceeds he received; in fact, he spent the money. However, he denies any liability to the Plan, arguing that he was not aware of the subrogation clause or any obligation to reimburse the Plan for

23

the more than $102,000 in benefits it paid on his behalf.

As previously discussed herein, Steven Terry's deposition testimony reflects he denied having discussed with his mother the settlement payment and how it should be distributed.  He further denied having any knowledge of subrogation and testified that he never discussed subrogation with his parents or his attorneys.  In fact, he denied all knowledge that the Plan paid his medical expenses.  He testified that he never received a bill or request for payment of any medical expenses, and had no knowledge of how they were paid.  His only concern was the amount he received in settlement.  He also denied that Ms. Terry asked him to pay her creditors with settlement proceeds.  He expressed dissatisfaction with the amount received in the settlement, although he understood it was the maximum allowed by state law.

Notwithstanding those express denials, Steven Terry also testified that he executed the "settlement statement" prepared by his attorney.  *Id.*, p. 51. That statement includes the following express representation by Steven Terry:

> I have been further advised and consulted with the issue of health insurance subrogation claims and my personal liability. I have discussed such with my family and determined it is in my best interest to settle all my claims.

Settlement Statement dated October 6, 2005, Plaintiffs' Ex. 32.

The Court concludes that, based on the record in this case, factual disputes exist as to whether Steven Terry acted in concert with Ms. Terry, with her consent, at her direction, or on her behalf vis-a-vis the settlement proceeds.  Moreover, Steven Terry's deposition raises credibility issues.  Credibility may not properly be assessed in consideration of a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135  (2000) (citations omitted).  Accordingly, whether Steven Terry is an Obligated Party having a fiduciary obligation

to the Plan is a question to be determined at trial.

Dunn:

Plaintiffs also seek judgment on their claim that Dunn is liable as an Obligated Party, having a fiduciary duty to ensure that the Plan was reimbursed from the settlement funds to the extent of the amount it paid for Steven Terry's medical expenses.  They argue that, because Dunn received a portion of the settlement proceeds which were subject to the subrogation clause, he has a fiduciary obligation to the Plan to ensure its subrogation rights are enforced.

Plaintiffs correctly argue that the Tenth Circuit has held a fiduciary obligation extends to an individual who exercises authority or control over ERISA plan assets.  *Coldesina,* , 407 F. 3d at 1143.  It is not disputed that Dunn received approximately $31,250.00 of the $125,000 GTCA settlement; that amount represented his attorney fee, as provided by the contingency fee agreement executed by Steven Terry.  Inasmuch as the settlement amount was subject to the subrogation clause of the Plan, Plaintiffs contend that Dunn had a fiduciary obligation to the Plan to ensure its rights were protected as a first priority lien against the settlement amount.

Dunn does not deny that he was aware of the Plan's subrogation clause.  Nor does he deny that he advised Ms. Terry to execute the Reimbursement Agreement; however, he denies that, at the time, he was acting as her attorney, and he argues that he represented only Steven Terry.  Dunn takes the position that the subrogation clause did not extend to  Steven Terry or to Dunn and creates no fiduciary obligation.  According to Dunn, the subrogation obligation extends only to Ms. Terry.[11]

As the Court has determined, the subrogation obligation is not limited to Ms. Terry but

---

[11]Dunn's arguments regarding her lack of control over the joint account shared with Steven Terry have been rejected by the Court in this Order.

extends to all Obligated Parties.  Plaintiffs interpret the facts presented as creating circumstances in which Ms. Terry, Steven Terry, and Dunn acted in concert, thereby rendering each of them an Obligated Party as that term is defined in the Plan.  For the reasons explained in this Order, the Court agrees that, to the extent the defendants acted in concert, they are Obligated Parties.

Dunn's arguments in opposition to Plaintiffs' summary judgment motion are based primarily on state law and discuss state court decisions involving insurance.  As Plaintiffs point out, however, ERISA preempts state law decisions interpreting insurance policies where, as here, the Plan is self-funded.  *See, e.g., Winchester v. Prudential Life. Ins. Co. of America*, 975 F.2d 1479, 1484 (10th Cir. 1992).  To the extent that Dunn relies on ERISA decisions, those decisions involve contractual issues which are not presented in this case.  As Plaintiffs point out, their claim is equitable in nature and is not a breach of contract claim.

The Court agrees with Plaintiffs that ERISA creates remedies that are equitable in nature. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 154 (1985).  Subrogation has long been recognized as an equitable remedy.  *See, e.g., New York Casualty Co. v. Sinclair Refining Co.*, 108 F.2d 65 (10th Cir. 1939).  In this case, Plaintiffs seek equitable relief including imposition of a constructive trust over the settlement proceeds or traceable property, and disgorgement.

A legal remedy cannot be pursued to recoup settlement funds received by a plan beneficiary in order to enforce a reimbursement provision in an ERISA plan.  *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 213 (2002).  Remedies are, instead, limited to traditional equitable remedies including, *inter alia,* constructive trusts or equitable liens.  *Id.*  Dunn argues that, although they characterize their claim as equitable in nature, Plaintiffs' equitable remedy is precluded because the settlement funds have been spent.   Although *Knudson* reached that

26

conclusion on the facts presented there, the Court agrees with Plaintiffs that the facts of this case are distinguishable.

In this case, although the cash received in the settlement has been spent, it constitutes specifically "identifiable funds" which were in the "possession and control" of the defendants. *See Mertens v. Hewitt Associates,* 508 U.S. 248 (1993).   Through the equitable remedies of an accounting and constructive trust, that cash can be traced to property.

The Court concludes that the legal arguments asserted by Dunn do not preclude summary judgment in favor of Plaintiffs.  However, there remains to be determined the question of whether, under the facts presented, Dunn has a fiduciary duty to the Plan because he acted in concert with Ms. Terry and/or Steven Terry regarding the settlement proceeds.

As noted above, the Court concludes that this question is the subject of a material factual dispute which depends, in part, on the Court's assessment of the testimony, including the credibility of the witnesses.  Further, as discussed above, the record reflects that Dunn does not recall his specific conversations with Ms. Terry regarding the proposed settlement and the subrogation clause. Although Dunn acknowledges that he advised Ms. Terry regarding subrogation in general, he did not recall the specific information he provided.  Ms. Terry recalled that Dunn advised her; when asked additional questions regarding the conferences she had with Dunn, she repeatedly stated she could not recall or did not know any details.

The record also presents a material factual dispute regarding the extent to which Dunn acted as Ms. Terry's attorney, notwithstanding the absence of a written fee agreement or other contract. It is undisputed that Ms. Terry attended at least two meetings with him, and he gave her advice regarding the subrogation agreement and her potential liability.  There is also evidence that, when

she decided to appeal the Plan's decision to suspend payment of her future Plan claims to offset the amount it claimed in subrogation, Dunn transmitted documents related to her appeal on her behalf. Although it is also undisputed that a different attorney appeared at the subsequent hearing, Ms. Terry testified that Dunn referred her to that attorney.   The record is insufficiently developed on this point to determine whether Dunn acted as her attorney in that regard.

The Court concludes that material factual disputes preclude a ruling on summary judgment regarding whether Dunn may be deemed an Obligated Party.   Accordingly, that issue must be reserved for trial.

Because the Court has determined that material factual disputes preclude summary adjudication of liability as to all Defendants, the Court will not address the various remedies sought by Plaintiffs.    The available equitable remedies, and the extent to which one or more may be appropriate in this case, will be determined at trial.

Ms. Terry's counterclaim for retaliatory interference with her ERISA rights:

Plaintiffs also seek summary judgment on Ms. Terry's counterclaim asserting that her employment was suspended in retaliation for her exercise of ERISA rights.    Ms. Terry's response to the summary judgment motion focuses primarily on the alleged impropriety of Plaintiffs' decision to offset the subrogation amount against her future claims under the Plan.  This issue, however, has been bifurcated and, pursuant to Judge Russell's previous order, will be determined from the Court's review of the administrative record.   Therefore, her arguments regarding the offset of benefits claimed are not properly considered in this motion.  Her allegation that her employment was suspended in retaliation for  the exercise of ERISA rights is the subject of Plaintiffs' summary

judgment motion, and the Court will focus only on that issue.

Pursuant to 29 U. S. C. § 1140, it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled" under ERISA.   A participant or beneficiary asserting such an allegation has a cause of action for equitable relief pursuant to 29 U. S. C. § 1132(a)(3).

To prevail on an ERISA retaliatory claim, a plaintiff must show that the defendant had the "specific intent to interfere with his ERISA rights." *Cunningham v. Adams*, 106 F. App'x 693, 698 (10th Cir. 2004) (citing *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993)).  That burden may be shown by direct or circumstantial evidence.  *Id.* (citing *Garratt v. Walker*, 164 F. 3d 1249, 1256 (10th Cir. 1998)(en banc)).

The Title VII burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) applies to ERISA retaliatory claims.  *Cunningham*, 106 F. App'x at 698.   Thus, a plaintiff must first establish a *prima facie* case of discrimination; if she does so, then the defendant has the burden of articulating a non-retaliatory reason for the challenged action, and the plaintiff then has the burden of demonstrating that the proffered reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-04.

In this case, the record reflects no evidence sufficient to show an inference that Plaintiffs acted with the specific intent to interfere with Ms. Terry's ERISA rights.   She exercised her rights by submitting over $100,000 in medical claims on behalf of her dependent, Steven Terry; those claims were paid.   The evidence in the record  establishes that her suspension did not occur until more than one year after the claims were presented and paid.  Plaintiffs' Ex. 41.  The evidence also reflects that, during that year, there is no evidence that Plaintiffs took any action against Ms. Terry

29

with respect to her medical benefits or her exercise of rights under the Plan.  The suspension occurred only after Plaintiffs learned that Steven Terry had received a settlement and only after Ms. Terry made no effort to satisfy the subrogation obligations in the Plan.  The record establishes that Plaintiffs did not learn about the settlement until more than one year after the Plan had paid over $100,000 in medical benefits on behalf of Ms. Terry and her dependent, Steven Terry.   The record also establishes that, in the interim, the Plan had attempted to obtain information regarding the status of Steven Terry's GTCA claim.  Notwithstanding her express acknowledgments of the Plan's subrogation provisions,  Ms. Terry never contacted Plaintiffs to inform them that the GTCA claim had been settled and money had been distributed.  Plaintiffs learned of the settlement only after several unsuccessful attempts to determine the status.  It was not until that time that the Plan advised Ms. Terry that it would investigate her conduct and that her employment was being suspended.

Ms. Terry's arguments in response to Plaintiffs' motion are conclusory; she contends that Plaintiffs "punished" her for submitting to the Plan claims for Steven Terry's medical expenses.  She offers no evidence to support that conclusion.   Accordingly, Ms. Terry has failed to satisfy  her *prima facie* burden.  Even if she had done so, Plaintiffs have presented a justifiable business reason for the suspension, as the evidence establishes that it was based on Ms. Terry's failure to comply with the subrogation requirements of the Plan.  She offers no evidence to show that Plaintiffs' reason is pretextual.

To the extent that Ms Terry's counterclaim seeks relief pursuant to 29 U.S.C. § 1104(a) on the basis that her employment was suspended in retaliation for the exercise of ERISA rights, Plaintiffs are entitled to summary judgment.  The issue of the propriety of the Plan's decision to offset her benefits, which is also the subject of her counterclaim, will be decided on the Court's

review of the administrative record after the adjudication of Plaintiffs' claims.

Conclusion:

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [Doc. No. 91] is GRANTED in part and DENIED in part. To the extent that Plaintiffs seek a determination that the phrase, "Obligated Party," in the Plan's subrogation clause extends to individuals other than the Plan participant, the motion is granted. To the extent Plaintiffs seek to hold Ms. Terry liable as a participant and Obligated Party, the motion is also granted. To the extent Plaintiffs seek a determination that, as a matter of law, Steven Terry and Dunn are also "Obligated Parties," the Motion is denied because material factual disputes preclude that conclusion. To the extent Plaintiffs seek judgment on Ms. Terry's counterclaim that her employment was suspended in retaliation for her exercise of ERISA rights, the motion is granted.

The remaining issues addressed in Plaintiffs' motion will be adjudicated in a nonjury trial at a date to be announced by the Court. Ms. Terry's counterclaim asserting a violation of ERISA based on the Plan's offset of benefits will be decided in a post-trial determination based on the administrative record.

IT IS SO ORDERED this __16th__ day of November, 2009.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE